# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**BARBARA GLAESER,**

       **Plaintiff,**

**vs.**                                                          **No.  05cv0753 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Glaeser's) Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 10]**, filed November 7, 2005, and fully briefed on January 12, 2006.  On November 5, 2004, the Commissioner of Social Security issued a final decision denying Glaeser's claim for disability insurance benefits and supplemental security income benefits.  Glaeser seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Glaeser, now forty-four years old (D.O.B. November 4, 1961), filed her application for disability insurance benefits and supplemental security income benefits on July 29, 2002 (Tr. 47, 493), alleging disability since March 23, 2001, due to "damaged discs on her back."  Tr. 19, 80. On September 2002, Glaeser returned to work as a photographer at the substantial gainful activity

level as defined by Social Security regulations.  Thus, the issue in this case is whether Glaeser was disabled between March 23, 2001 and September 2002.  Glaeser has a Bachelor's Degree in Business Administration and past relevant work as an analyst, an appraisal assistant, and a race and human relations educator assistant.  Tr. 19, 81.  On November 5, 2004, the ALJ denied benefits, finding Glaeser was not disabled as she could perform a full range of sedentary work during the relevant time period.  Tr. 21.  The ALJ found Glaeser's mild degenerative changes in her cervical and lumbar spine and her left knee's torn medial meniscus with chondromalacia were severe impairments but not "severe enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  Tr. 22.  Glaeser filed a Request for Review of the decision by the Appeals Council.  On May 26, 2005, the Appeals Council denied Glaeser' request for review of the ALJ's decision.  Tr. 5.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Glaeser seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of

impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

Glaeser raises one issue for the Court's review. Glaeser contends the record supports her claim that she suffered from severe non-exertional pain that interfered with her ability to do work between March 2001 and September 2002. Mem. in Support of Mot. to Reverse at 4-5. Accordingly, Glaeser argues that the ALJ erred when he conclusively relied on the Medical-Vocational Guidelines (the grids) to find she was not disabled during this time frame.

It is well established that the grids should not be applied conclusively "unless the claimant could perform the full range of work required of [the pertinent RFC] category on a daily basis and unless the claimant possesses the physical capabilities to perform most of the jobs in that range." *Ragland v. Shalala*, 992 F.2d 1056, 1057 (10th Cir.1993). "The use of the grids is inappropriate when a claimant has a nonexertional impairment such as pain, unless the ALJ can support a finding that the claimant's pain is <u>insignificant</u>." *Adkins v. Barnhart*, 80 Fed.Appx. 44, 47 (10th Cir. Oct. 23, 2003)(emphasis added). Therefore, the Court evaluates the record to determine whether substantial evidence supports the ALJ's decision that Glaeser was capable of engaging in a full range of sedentary work and was physically capable of performing most jobs in that category. *See Ragland*, 992 F.2d at1057. "Absent such evidence the [Commissioner] cannot

satisfy the burden at step five without producing expert vocational testimony or other similar evidence to establish the existence of significant work within the claimant's capabilities." *Id.*

The record supports a finding that Glaeser suffered from the nonexertional impairment of significant pain during the relevant period.  Therefore, the ALJ erred in conclusively applying the grids.

**<u>Medical Records from Raymond Vance, M.D.</u>**

On April 27, 2001, Raymond Vance, M.D., an orthopedic surgeon, evaluated Glaeser.  Tr. 127-130.  Dr. Vance diagnosed Glaeser with "spraining injury to the neck and lumbar spine."  Tr. 129.  Dr. Vance opined as follows:

> At the present time, Ms. Glaeser presents with what appears to be relatively minor soft tissue injuries.  She describes a history of ongoing chronic symptomatology in the same parts of her body.
>
> She demonstrates an emotional liability during the interview, which suggests a significant component of magnification of her condition and raises a serious concern about her prognosis as it relates to the resolution of her subjective complaints.
>
> I suggest that she be referred to a physiatrist and total temporary disability will be in effect until that is accomplished. Clearly, she is not in need of any surgical procedure of any sort at the present time.

Tr. 129.

**<u>Medical Records from Victoria F. Fernandes, M.D.</u>**

On May 15, 2001, Victoria F. Fernandes, M.D., a Specialist in Physical Medicine and Rehabilitation (physiatrist), evaluated Glaeser.  Tr. 151.  Dr. Fernandes performed a thorough physical examination and diagnosed Glaeser with Cervical strain, knee strain, and lumbosacral strain. Tr. 153.  Dr. Fernandes opined: "The patient appears by her current subjective complaints, as well <u>as my objective findings</u>, to be temporarily totally disabled.  Dr. Fernandes ordered an

5

MRI of the cervical spine and the lumbosacral spine and started Glaeser on Vioxx 25 mg four times a day and Elavil 10 mg at bedtime. Tr. 154. Dr. Fernandes also prescribed physical therapy and a TENS unit.

On May 22, 2001, Dr. Fernandes evaluated Glaeser and noted the "physical examination was unchanged." Tr. 149. Glaeser reported she was taking the Vioxx and Elavil with no "significant change in her pain." *Id.* At that time, Glaeser reported she was bedridden and was taking Vicodin, two tablets, and Darvocet, one tablet, daily. Again, Dr. Fernandes opined Glaeser was "temporarily totally disabled." *Id.*

On May 29, 2001, Dr. Fernandes diagnosed Glaeser with cervicothoracic strain and lumbar strain. Tr. 147. Dr. Fernandes noted "range of motion of the lumbar spine is guarded with pain with extension, side bending, and flexion." *Id.* Dr. Fernandes discontinued the Vioxx and prescribed Neurontin and Elavil Dr. Fernandes opined Glaeser was "temporarily totally disabled." Tr. 148.

**Medical Records from Mark H. Mikulics, M.D.**

On June 4, 2001, Mark H. Mikulics, M.D., an orthopedic surgeon, evaluated Glaeser. Tr. 259-266. On that day, Glaeser complained of "incredible pain in my lower back, my neck is stiff and my left knee bothers me when I walk." Tr. 260. Glaeser reported having problems sleeping, sitting, walking and driving. *Id.* Glaeser also reported she was "bedridden most of the time and having problems doing several chores." *Id.* The examination of the cervical spine revealed "midline paravertebral tenderness," "full range of motion" and "pain with extremes of range of motion." Tr. 262. The lumbar spine examination revealed "left-sided paraspinal tenderness without spasm." Tr. 263. The knee examination revealed "anterior medial and anterior lateral

joint line tenderness." Tr. 264.  Dr. Mikulics diagnosed Glaeser with contusion, left hip, left knee sprain, cervical myofascial strain, and lumbosacral myofascial strain.  Tr. 264.  Dr. Mikulics prescribed Darvocet and referred Glaeser for an MRI "due to the patient's persistent and unrelenting neck and back pain."  Tr. 265.  Dr. Mikulics also referred Glaeser to another specialist for an evaluation of her knee.  Dr. Mikulics opined Glaeser was temporarily totally disabled.  *Id.*

On July 23, 2001, Glaeser returned for a follow-up with Dr. Mikulics.  Tr. 256-257.  Dr. Mikulics noted Glaeser was still complaining of neck, back, and left knee pain.  Tr. 256.  Dr. Mikulics noted Glaeser's lumbosacral x-rays were normal.  Dr. Mikulics requested authorization for an MRI.  The diagnoses remained the same.  Dr. Mikulics prescribed Darvocet and noted Glaeser was to remain off work until September 10, 2001.

On August 20, 2001, Glaeser returned for a follow-up with Dr. Mikulics.  Tr. 254-255.  Dr. Mikulics noted Glaeser continued to complain of neck, back, and left knee pain.  Tr. 254.  The MRI revealed "trace chondromalacia on the medial ridge of the patella" of the left knee and "essentially normal study with minimal lower lumbar facet hypertrophy" of the lumbar spine.  *Id.* Glaeser also had "mild degenerative changes at C4-5 and C5-6 of the cervical spine.  Tr. 255.  Dr. Mikulics noted, "she continues to complain vehemently regarding her neck, back and knee."  *Id.* Due to her "significant subjective complaints in light of minimal objective findings," Dr. Mikulics recommended a second opinion consultation.  *Id.*

On September 24, 2001, Dr. Mikulics noted, "the patient was evaluated by Dr. Harris who recommended knee surgery."  Tr. 252.  Dr. Mikulics diagnosed Glaeser with contusion, left hip, possible medial meniscus tear/chondromalacia, left knee, C4-5, C5-6 cervical spondylosis, and minimal lower lumbar facet hypertrophy.  Tr. 253.  Dr. Mikulics requested authorization for Dr.

7

Harris to proceed with left knee surgery and authorization for Glaeser to be evaluated by Randall Smith, M.D., for her neck and back complaints.  Dr. Mikulics prescribed Darvocet and recommended Glaeser remain off work until November 5, 2001.

On November 5, 2001, Glaeser returned for a follow-up with Dr. Mikulics.  Tr. 249-251.  Dr. Mikulics noted Dr. Harris had performed left knee surgery on October 25, 2001.  Tr. 249.  Glaeser complained of depression but did not want to consult a psychologist.  By this time, Glaeser had consulted Dr. Randall Smith.  Dr. Smith found no indication for surgery but recommended  cervical traction, therapy, and epidural steroid injections in the neck and in the lower back.  Tr. 250.  Dr. Mikulics prescribed Darvocet, cervical traction, post cervical epidural steroid injections, and referred her to Michael Moon, M.D., for pain management.  *Id.*  Dr. Mikulics recommended Glaeser remain off work until December 17, 2001.

On December 17, 2001, Glaeser returned for her follow-up with Dr. Mikulics.  Tr. 246-247.  Glaeser reported Dr. Moon had evaluated her and performed two lumbar epidural steroid injections with minimal relief.  Glaeser reported Dr. Moon had recommended a lumbar facet injection or possible discogram.  According to Glaeser, Dr. Moon had not evaluated her cervical spine or prescribed any medication.  Glaeser reported she was evaluated by Dr. Markman, a psychiatrist.  Dr. Markman had prescribed Seraz and referred her for an EKG and blood studies.  Tr. 247.  Glaeser also reported she was seeing a psychotherapist at Kaiser.  Dr. Mikulics referred Glaeser to Dr. Moon for a lumbar facet injection, possible lumbar discogram, and a cervical spine evaluation for possible cervical epidural steroid injections.  Dr. Mikulics noted Glaeser would require cervical traction after her cervical epidural steroid injections.  Dr. Mikulics prescribed Darvocet and recommended Glaeser remain off work until January 28, 2002.

On January 28, 2002, Dr. Mikulics evaluated Glaeser. Tr. 244. Glaeser continued to complain of back pain and less knee pain. Dr. Harris had recommended additional physical therapy. Dr. Mikulics treatment plan included the following:

1. The patient will continue in therapy per the recommendation of Dr. Harris.
2. The patient will have a facet injection today performed by Michael Moon, M.D.
3. The patient remains totally disabled and, as such, will be unable to relocate from her present residence at this time.
4. The patient continues to require cervical epidural steroid injections and cervical traction.
5. The patient is prescribed Darvocet.
6. The patient's pain management, including narcotic analgesics, will now be managed by Michael Moon, M.D.

Tr. 245. Dr. Mikulics recommended Glaeser remain off work until March 11, 2002.

On February 25, 2002, Dr. Mikulics evaluated Glaeser for the last time. Tr. 238-245. Glaeser reported she attended physical therapy which was minimally successful. Tr. 238. Glaeser also reported the facet injections were not successful. At this time, Glaeser was taking Oxycontin and Darvocet as prescribed by Dr. Moon. Glaeser continued receiving therapy from Leo Markman, M.D., a psychiatrist at Kaiser. Glaeser complained that she continued to have neck and back pain.

Dr. Mikulics performed a physical examination and noted midline and paravertebral tenderness of the cervical spine. Tr. 238. Examination of the lumbar spine was negative. The left knee had healed with no abnormalities noted. Tr. 240. Dr. Mikulics found Glaeser was permanently disabled and would require continued long-term pain management for the prescription of narcotic analgesics with Dr. Moon. Tr. 242.

9

**Medical Records from Michael Moon, M.D.**

On December 6, 2001, Dr. Michael Moon, a physician specializing in Acute and Chronic Pain Management, evaluated Glaeser, diagnosed her with "Low back pain, possible discogenic component" and noted the following:

> Based on my evaluation of Barbara Glaeser, it appears that she continues to suffer persistent low back pain without any radicular features. There are some components of her low back injury which may suggest a disc injury. I believe that she would be a good candidate to undergo a trial of three epidural steroid injections under fluoroscopic guidance to insure proper placement of the medication. I will proceed with the first injection today and have her return to the clinic in 1-2 weeks for the second injection in the series.

Tr. 224. On December 14, 2001, Dr. Moon administered the second epidural steroid injection with "significant relief." Tr. 219. Glaeser reported "no significant improvement" with the first epidural injection. Tr. 217. Glaeser rated her pain 6/10 on a VAS scale without any radicular pain in her lower extremities. *Id.*

On January 28, 2001, Dr. Moon admitted Glaeser to the La Jolla Orthopaedic Surgery Center and <u>performed bilateral lumbar facet joint injections</u>. Tr. 195-216. Dr. Moon opted for this procedure due to Glaeser obtaining "no significant relief following <u>two lumbar epidural steroid injections</u>." Tr. 195. Dr. Moon described Glaeser's low back pain as primarily axial, reproduced with hyperextension of the spine. Tr. 195-196.

On February 6, 2002, Glaeser returned for her follow-up with Dr. Moon. Tr. 193. Dr. Moon diagnosed Glaeser with "Lumbar Discogenic Pain" and noted:

> Barbara Glaeser is a 40 year-old woman who returns to my clinic status post diagnostic lumbar facet injections performed by myself on January 28, 2002. The patient did not have any significant or even temporary relief of actual low back pain following the diagnostic facet joint injections. She continues to complain of constant sharp and aching low back pain without any radicular symptoms. The pain is worsened with prolonged sitting and flexion. She rates her discomfort to be 8/10 on a VAS scale. She has been seeing her psychiatrist Dr. Markman at Kaiser Permanente. She notes increasing low back spasms following the interventional spine procedure.

> On examination the patient is in a moderate amount of discomfort, lumbar flexion is mildly limited at about 85 degrees, lumbar extension is normal, she has a moderate lumbar paraspinous tenderness to palpation; skin integrity is intact without any breakdown or evidence of infection; there is no atrophy or edema to the lower limbs.

Tr. 193.  Dr. Moon opined Glaeser was a "candidate for chronic narcotic therapy" and placed her on a trial of Oxycontin 10 mg every twelve hours.  Dr. Moon also prescribed Darvocet N-100 every four hours as needed for break through pain with a maximum of 6 tablets per day.  Tr. 194.

On March 6, 2002, Glaeser returned for her follow-up with Dr. Moon.  Tr. 191-192.  Glaeser reported she was experiencing "fairly good relief of her actual low back with use of the Oxycontin."  Tr. 191.  Dr. Moon noted he would continue to manage Glaeser's pain and prescribed Oxycontin and Darvocet N-100.  Tr. 192.

On March 28, 2002, Glaeser returned for her follow-up with Dr. Moon.  Tr. 189-190.  Glaeser reported she was responding well to the Oxycontin and continued to use Darvocet for the break through pain.  Glaeser rated her pain 5/10 on a VAS scale.  Glaeser also informed Dr. Moon that her primary care physician had prescribed Paxil which had dramatically improved her overall mood.  Tr. 189.  On examination, Glaeser exhibited severe discomfort with hyperextension of the lumbar spine and mild paraspinous and upper trapezius tenderness to palpation.  *Id.*  Dr. Moon refilled the Oxycontin and the Darvocet N-100.  Tr. 190.

On May 2, 2002, Glaeser returned for her follow-up with Dr. Moon.  Tr. 187-188.  Glaeser reported significant relief with Oxycontin.  Tr. 187.  Glaeser rated her pain 5/10 on a VAS scale.  Dr. Moon noted Glaeser was mildly depressed.  The physical examination revealed mildly limited lumbar flexion, tenderness in the cervical and lumbar region to palpation.  Tr. 187-188.  Dr. Moon continued Glaeser on the same dosage of Oxycontin and Darvocet N-100.

On June 3, 2002, Glaeser returned for her follow-up with Dr. Moon. Tr. 185-186. Glaeser reported "good relief" with the Oxycontin. Tr. 185. On examination, Dr. Moon noted Glaeser's mood was mildly depressed. Dr. Moon also noted Glaeser had difficulty getting up from a seated position and had tenderness in the neck and lumbar region to palpation. Dr. Moon continued the Oxycontin and Darvocet N-100 and noted Glaeser "remains very compliant with her medications without exhibiting any drug seeking behaviors." Tr. 185-186. Dr. Moon prescribed Paxil and a topical gel containing Keoprofen and Cyclobenzaprine for her back pain.

On June 24, 2002, Dr. Moon noted Glaeser had called to inform her of her move to New Mexico. Tr. 184. Dr. Moon noted he would mail Glaeser a prescription for one month's supply of Oxycontin to allow Glaeser time to find a pain management physician in New Mexico.

On October 2, 2002, Glaeser returned to San Diego for a follow-up with Dr. Moon. Tr. 182-183. Glaeser reported she had not found a chronic pain management specialist in New Mexico to continue her narcotic analgesic medications. Tr. 182. Glaeser rated her pain 8/10 on a VAS scale since discontinuing her medications. On examination, Dr. Moon noted "moderate tenderness in the cervical paraspinals and lumbar paraspinals to direct palpation." Tr. 182. Dr. Moon refilled the Oxycontin and the Darvocet N-100. Dr. Moon advised Glaeser to find a chronic pain management specialist closer to home. Tr. 183.

**Medical Records from Rodney Henderson, M.D.**

On September 30, 2002, Rodney Henderson performed a "Defense Qualified Medical Evaluation" at the request of Glaeser's employer. Tr. 285-297. Dr. Henderson performed a physical examination. Dr. Henderson found minimal tenderness in lower midline of the cervical spine, mild tenderness of from the L4-5 distally to the sacroiliac joint bilaterally, and positive

Wadell's test for superficial tenderness, simulation/rotation and over-reaction.  Tr. 288.  The rest of the physical exam was unremarkable.  Dr. Henderson diagnosed Glaeser with the following: (1) status post left hip contusion; (2) status post left knee arthroscopic partial medial meniscectomy, chondroplasty and plica excision; (3) chronic neck pain secondary to pre-existing cervical spondylosis; and (4) chronic low back pain, pre-existing.  Tr. 293.  Dr. Henderson opined that Glaeser's complaints with respect to her cervical and lumbar spines were not the result of the March 26, 2001 injury, but were that of a pre-existing chronic condition.  Tr. 294.  Dr. Henderson also opined Glaeser would "require future medical care to include the use of narcotics or non-narcotic analgesics on a chronic long-term basis." *Id.*

The evidence indicates that during the relevant time period Glaeser underwent two epidural steroid injections and bilateral lumbar facet joint injections.  These procedures are not generally performed for "insignificant pain."  Glaeser also required narcotic analgesics to control her pain.  In addition, as early as December 2001, Glaeser sought psychiatric and psychotherapy for her complaints of severe pain.  Tr. 247.  "Complaints of pain cannot be dismissed as incredible merely because they stem in part from a psychological abnormality . . . ." *Teter v. Heckler*, 775 F.2d 1104, 1106 (10th Cir. 1985).  As previously noted, when a claimant has a nonexertional impairment such as pain, conclusive application of the grids is inappropriate.  This is such a case.  Glaeser suffered from severe nonexertional pain during the relevant time period.  Accordingly, the ALJ erred when he conclusively applied the grids.  On remand, the ALJ shall redetermine Glaeser's RFC and consult with a vocational expert.  However, the Court expresses no opinion as to the extent of any impairment, or whether Glaeser was or was not disabled during the relevant

13

time period within the meaning of the Social Security Act.  This remand simply assures that the

ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**